UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROSEMARY NIEVES,                                    :

               Plaintiff,                        :        13 Civ. 0107 (AJN) (AJP)

        -against-                              :        **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, Commissioner of          :
Social Security,
                                                   :

              Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Alison J. Nathan, United States District Judge:**

        Plaintiff Rosemary Nieves, represented by counsel, brings this action pursuant to §

205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of Social Security (the "Commissioner") denying her Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") benefits.  (Dkt. No. 2: Compl.)  Presently before

the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P.

12(c).  (Dkt. No. 13: Comm'r Motion; Dkt. No. 23: Nieves Motion.)  Although Nieves' motion is

labeled as one for judgment on the pleadings, her counsel's brief only argues for a remand to the

Commissioner.  (See Dkt. No. 24: Nieves Br. at 10-15)

        For the reasons set forth below, the Commissioner's motion should be GRANTED

and Nieves' motion should be DENIED.

**FACTS**

**Procedural Background**

On March 24, 2009, Nieves applied for DIB and SSI benefits, alleging that she was disabled since January 1, 2009.  (Dkt. No. 11: Administrative Record filed by the Comm'r ("R.") 12, 234-45.)  Nieves alleged disability related to arthritis pain, depression, and drowsiness and dizziness caused by her arthritis medication.  (R. 39, 41, 47, 64, 276, 278.)  On May 20, 2009, the Social Security Administration ("SSA") found that Nieves was not disabled, and denied her applications. (R. 60-64.)  On August 26, 2009, Nieves requested an administrative hearing.  (See R. 12.)

Administrative Law Judge ("ALJ") Victoria A. Ferrer conducted the hearing by video conference on May 17, 2011.  (R. 12, 25-57.)  ALJ Ferrer presided over the hearing from Puerto Rico and Nieves and her attorney were present at a Social Security hearing office in Manhattan.  (R. 25, 27.)  During and after the hearing, Nieves amended her alleged disability onset date to January 1, 2011.  (R. 52-53, 297; see pages 12-13 below.)  On July 22, 2011, ALJ Ferrer issued a written decision finding that Nieves was not disabled.  (R. 9-19.)  ALJ Ferrer's decision became the Commissioner's final decision when the Appeals Council denied Nieves' request for review on November 7, 2012.  (R. 1-6.)

On January 10, 2014, the Commissioner filed a motion for judgment on the pleadings.  (Dkt. No. 13: Comm'r Motion.)  On March 3, 2014, Nieves filed a motion for judgment on the pleadings or, alternatively, for a remand to the Commissioner based on additional medical evidence that Nieves contends was submitted to the Appeals Council.  (Dkt. No. 23: Nieves Motion; Dkt. No. 24: Nieves Br.)  Nieves included in her motion additional medical records from Beth Israel Medical Center that were not considered by the Appeals Council.  (Nieves Br.; Dkt. No. 24: Brill

Aff. Exs. 1-4.)  On March 17, 2014, the Commissioner filed a reply memorandum opposing Nieves' motion.  (Dkt. No. 27: Comm'r Reply Br.)

The issues before the Court are: (1) whether the Commissioner's decision that Nieves was not disabled is supported by substantial evidence, and (2) whether Nieves' submission of additional evidence warrants a remand.

**Non-Medical Evidence**

Nieves, born on January 1, 1962, was forty-nine years old at the January 1, 2011 alleged amended onset of her disability.  (R. 234.)  Nieves speaks and reads English, and graduated from high school.  (R. 319, 465.)  Nieves lives with her two children, ages eighteen and twenty.  (R. 42, 329.)

From January 1, 2002 through December 31, 2008, Nieves worked as a babysitter and domestic worker.  (R. 235, 315-16, 321-22.)  She continued babysitting in 2009 and 2010.  (R. 28.)  Additionally, in 2006 she performed volunteer work in a security assistance office.  (R. 340-41.)  For six months in 2007, she worked for the New York City Parks Department.  (R. 280, 340, 342, 361, 376.)

Nieves stated that she can sit for about thirty minutes, stand for about fifteen minutes, and walk for a half hour before needing to rest.  (R. 46, 335.)  Nieves testified that she is unable to perform any household chores, with the exception of preparing simple meals and washing dishes.  (R. 43-45, 330-31.)  Nieves does not spend time with family and friends.  (R. 42-43.)  She spends most days sleeping, watching television and listening to the radio; she spends fifty to sixty percent of her day laying down.  (R. 43, 49, 329, 333-34.)  She is prescribed Zoloft and Ambien.  (R. 41, 48.)  She reported experiencing occasional visual and auditory hallucinations, and panic attacks. (R. 49-50.)  Nieves stated at the hearing that she was hospitalized at Beth Israel hospital for suicidal

4

thoughts within the last year.  (R. 50.)  Nieves leaves her house, using a cane, to go to doctor appointments three times per week.  (R. 40-41, 49, 332.)

Nieves complained of back pain and leg cramps.  (R. 334.)  She described the pain as ten out of ten, all the time.  (R. 47, 347.)  She does not have problems paying attention, and can follow spoken and written directions.  (R. 335.)

**The Medical Evidence Before The ALJ**

**Prior to January 1, 2011**

**Physical Impairments**

In 2003, Nieves' physician at St. Clare's Hospital & Health Center prepared a note indicating that Nieves was having difficulty walking and was unable to perform physical labor due to chronic joint pain.  (R. 387.)  In May 2003 (R. 397-405) and November  2003 (R. 421-31), doctors at H.S. Systems Inc. evaluated Nieves, diagnosing "[m]ultiple joint pain" (R. 399).  The physicians recommended to the New York City Human Resources Administration ("NYC-HRA") that Nieves should perform work with limitations: she should work inside, travel a limited distance and avoid rush hour travel.  (R. 397, 421.)  Dr. Weissbart of HHS concluded that Nieves "is able to sit, stand, walk, handle objects, hear, speak and travel" and physically "able to perform light activity."  (R. 400, 424.)  Orthopedist Dr. Tsinis concluded that Nieves could "perform light sedentary activities," although she was "moderately  impaired" as to lifting, pushing, pulling and "prolonged standing and ambulation."  (R. 405.)

In March 2005, Nieves received a similar assessment.  (R. 435-46, 452.)

On December 29, 2005, the NYC-HRA assigned Nieves to work in a medical services clinic.  (R. 454-58.)

In October 2008, Nieves visited St. Vincent's Hospital & Medical Center complaining of joint pain. (R. 559.) The Hospital's record related Nieves' complaints and past medical history, but contained no findings. (R. 559.)

On December 23, 2008, Nieves saw Dr. Paul Bushkuhl at St. Vincent's Hospital, complaining of low back pain radiating to her feet with straight leg raising bilaterally. (R. 557.) She stated that her pain was relieved only by Percocet, which she obtained from her mother. (R. 557.) She also stated that she had missed her prior physical rehabilitation appointments. (R. 557.) Dr. Bushkuhl assessed chronic low back pain and prescribed Mobic and Ultram. (R. 558.) He encouraged her to keep her rehabilitation appointments in the future, and to bring documentation of her reported MRI finding of a herniated disc to her next appointment. (R. 558.) Dr. Bushkuhl noted in the record that he knew Nieves, that she had made a prior similar presentation and had missed rehabilitation appointments. (R. 558.)

On January 2, 2009, Nieves returned to St. Vincent's Hospital for an evaluation of her back pain with Dr. Nanwai Pak. (R. 554.) Dr. Pak observed that Nieves walked with a slight forward bend. (R. 554.) Her range of motion of the lumbosacral spine was normal. (R. 554.) She had muscle spasm and tenderness in the lumbosacral spine and paravertebral area. (R. 554.) Her strength was five out of five. (R. 554.) No sensory loss was present. (R. 554.) Dr. Pak's assessment was that Nieves' lower back pain was caused by spinal canal stenosis or radiculopathy. (R. 554.) He ordered an MRI, prescribed physical therapy and pain medication, and ordered a follow-up in one month. (R. 554.) Although Nieves attended physical therapy on January 22, 2009, she failed to respond to the Hospital's subsequent attempts to schedule additional appointments. (R. 620.)

In January 2009, Nieves underwent a FEGS evaluation.  (R. 462-91, 513-35, 570-80.)[1/]  As part of Nieves' FEGS assessment, Dr. Cindy Grubin conducted a basic medical screening.  (R. 473-77.)  Nieves reported depression, asthma, and pain caused by a herniated disc and arthritis.  (R. 473.)  She had decreased range of motion in her low back due to pain.  (R. 474.)  Her respiratory, neurological, sensory, and motor and reflex findings were normal.  (R. 474.)  Dr. Grubin determined that Nieves' arthritis and herniated disc required treatment before a functional capacity assesment could be made.  (R. 476.)

On February 12, 2009, Dr. Bushkuhl reevaluated Nieves.  (R. 553.)  He found she had limited forward bending, paraspinal tenderness, and pain from her low back to her feet with straight raising bilaterally.  (R. 553.)  Nieves experienced slight improvement in her back pain with treatment including physical therapy and pain medications.  (R. 450.)  An MRI report was pending.  (R. 450.)  Dr. Tara Bellamkonda completed Nieves' corresponding FEGS Treating Physician's Wellness Plan Report, and diagnosed her with arthritis and a herniated disc in her lower back.  (R. 450-51, 536-37.)  Dr. Bellamkonda identified Nieves as "[t]emporarily unemployable."  (R. 451.)

On February 13, 2009, Dr. Pak examined Nieves.  (R. 552.)  Nieves stated her pain level was ten out of ten.  (R. 552.)  Dr. Pak reported that Nieves' exam showed limited flexion secondary to tenderness.  (R. 552.)  She had tenderness to palpation through her paraspinal muscles bilaterally.  (R. 552.)  Her hip flexor strength was four out of five bilaterally, and five out of five otherwise.  (R. 552.)  Sensation to light touch was intact, and Nieves had full range of motion throughout her joints.  (R. 552.)

---

[1/]    FEGS helps cash assistance applicants and recipients with complex barriers to employment to obtain employment or federal disability benefits.  See FEGS Health and Human Services, http://www.fegs.org/services/welfare_to_work/wecare (last visited Apr. 1, 2014).

On April 6, 2009, Nieves saw Dr. John Andrilli at St. Vincent's Hospital.  (R. 549-50.)  Nieves refused to have a "'shot'" in her back as her rehabilitation specialist recommended.  (R. 549.)  She stated that Percocet completely alleviated her back pain, bringing it down from a ten to a zero on the pain scale.  (R. 549.)  Upon examination, Nieves had limited range of motion, tenderness, and muscle spasm in her spine.  (R. 549.)  Sensation was intact and patellar reflexes were positive.  (R. 549.)  Dr. Andrilli assessed chronic low back pain, gave Nieves a prescription for a heating pad, and recommended that she lose ten to fifteen pounds to help alleviate her pain.  (R. 550.)  He instructed her to follow up at the pain clinic for pain medications.  (R. 549-50.)

On April 13, 2009, Gabriele Sofos prepared a FEGS Wellness Summary.  (R. 478-501.)  The Summary essentially was blank; it indicated that Nieves' arthritis and back pain were unstable and that her Wellness Plan was being extended.  (R. 491.)

That same day, in connection with Nieves' application for Social Security, Dr. Louis Tranese examined Nieves.  (R. 543-47.)  Nieves appeared to be in moderate distress, demonstrating facial grimacing and moving slowly in the exam room.  (R. 544.)  However, she neither used an assistive device, nor needed help changing or moving around during the exam.  (R. 544.)  She reported arthritic back and knee pain.  (R. 543.)  She was able to walk on her heels and toes, with complaints of back pain.  (R. 544.)  She squatted only partially due to complaints of back and knee pain.  (R. 544.)  She stated that she was capable of handling her personal grooming and hygiene, but that her children assisted with household maintenance.  (R. 544.)

Nieves' hand and finger dexterity were intact, and her grip strength was five out of five.  (R. 544.)  She had full ranges of motion in the cervical spine and upper extremity joints, without pain or spasm.  (R. 544.)  She had full strength, no muscle atrophy and no sensory or reflex

abnormality.  (R. 544.)  There was no joint inflammation, effusion, or instability in the upper extremities.  (R. 544.)

In the thoracic and lumbar spines, Nieves was able to flex forward forty degrees and was limited by pain.  (R. 545.)  She had right-sided paravertebral tenderness and moderate lumbar paraspinal spasm on the right.  (R. 545.)  There was no sacroiliac joint or sciatic notch tenderness. (R. 545.) Straight leg raise was positive bilaterally in the supine position at forty-five degrees of hip flexion on the right and at thirty degrees of hip flexion on the left.  (R. 545.)  Seated straight leg raise was positive bilaterally on full knee extension.  (R. 545.)  Nieves had full ranges of motion of the lower extremity joints, with five out of five strength, no muscle atrophy, and no sensory abnormalities.  (R. 545.)  Her reflexes were zero out of four except the left ankle, which was two plus/four plus.  (R. 545.)  There was no joint effusion, inflammation or instability.  (R. 545.)  X-rays of the lumbosacral spine were negative.  (R. 545, 547.)

Dr. Tranese diagnosed chronic discogenic lower back pain with radicular symptoms and a report of lumbar disc herniation and bilateral knee pain.  (R. 545.)  He noted that Nieves had severe limitations of heavy lifting, moderate to marked limitations of frequent bending and squatting, and moderate limitations of repetitive stair climbing and walking long distances.  (R. 545.)  She may have had mild to moderate limitations with sitting or standing for long periods.  (R. 545-46.)

On May 14, 2009, consultant Dr. Fletcher reviewed Nieves' medical records and completed a "Physical Residual Functional Capacity Assessment."  (R. 581-86.)   Dr. Fletcher opined that Nieves had a severe impairment that did not meet or exceed any listed impairments, and that Nieves "retains the RFC [residential functional capacity] [for] past work as a domestic worker." (R. 583.)  Dr. Fletcher found occasional limitations on climbing, stooping, kneeling, crouching and

crawling, but no manipulative limitations.  (R. 583-84.)  Dr. Fletcher concluded that Nieves could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and could stand or walk for six hours and sit for six hours in an eight hour work day.  (R. 582.)

On August 7, 2009, Dr. Pak completed a Treating Physician's Wellness Plan Report for Nieves' public assistance case.  (R. 538-39.)  Dr. Pak diagnosed Nieves with bilateral lumbago/sciatica.  (R. 538.)  Dr. Pak indicated that Nieves had limited range of motion of flexion, extension, side bending and rotating at her waist.  (R. 538.)  He considered Nieves to be "[t]emporarily unemployable."  (R. 539.)

On October 24, 2009, Dr. Marina Fronshtein completed a Treating Physician's Wellness Plan Report.  (R. 540-41.)  She found Nieves had severe back and hip pain with evidence of disc herniation at the thoracic and lumbar levels, with likely impingement at the thoracic and lumbar roots.  (R. 540.)  She diagnosed Nieves with a herniated disc and low back pain.  (R. 540.)  Nieves' medications were Neurontin, Percocet and Lidoderm patch.  (R. 540.)  Dr. Fronshtein expected Nieves to begin physical therapy and found that she was unable to work for at least twelve months.  (R. 541.)

### Mental Impairments

During her January 2009 FEGS evaluation, Nieves reported that in 2005, she had been under treatment at St. Vincent's Hospital for depression and anxiety, and that she felt depressed periodically for the past seven years due to her medical and financial concerns and her mother's illness.  (R. 467-68, 470.)  However, she denied any suicidal ideation, plan or intent, and denied currently receiving mental health care.  (R. 467-68.)  She stated that during the evening prior to the interview she experienced a visual hallucination in the form of a shadow, and heard voices calling

her name in December 2008. (R. 467.) Nieves had good cognition and thought clearly. (R. 469.) The evaluation noted that Nieves had moderate depression. (R. 467-68, 470.)

On April 22, 2009, Joyce Schreiber, Ed. D., conducted a psychiatric examination of Nieves in connection with her Social Security disability application. (R. 565-59.) Nieves traveled alone to the exam via public transportation for twelve miles. (R. 565.) Nieves claimed that she last worked in 2007 for the Parks Department and denied any other significant work history. (R. 565.) She stated that she was not currently receiving psychiatric treatment and was last under psychiatric care in 2004 for depression and anxiety. (R. 565.) She alleged symptoms of depression and anxiety and stated that she heard knocking at her door while sleeping at night. (R. 566.)

Dr. Schreiber indicated that Nieves dressed appropriately, and her personal hygiene and grooming were good. (R. 566.) Nieves' motor behavior and mood were somewhat depressed, but her eye contact was appropriately focused. (R. 566.) She spoke clearly and fluently. (R. 566.) Her thought processes were coherent and goal-directed with no evidence of hallucinations, delusions or paranoia. (R. 566.) Her sensorium was clear and she was oriented to time, place and person. (R. 567.) Her attention and concentration were intact. (R. 567.) She was able to count forward and backward and perform simple calculations. (R. 567.) Her recent and remote memory skills were intact. (R. 567.) She appeared to be of low average intelligence and to have an adequate fund of information. (R. 567.)

Nieves denied having close friends, hobbies or interests. (R. 567.) She claimed she spent her day laying in bed watching television or listening to music when she did not have a medical appointment. (R. 567.) She stated that she was able to bathe and groom herself but that she could not do household chores. (R. 567.)

Dr. Schreiber indicated that Nieves appeared capable of following, understanding, and remembering simple instructions and directions, performing simple tasks with supervision and independently, maintaining attention and concentration for tasks, regularly attending to a routine, maintaining a schedule, making appropriate decisions, learning new tasks, and relating to and interacting appropriately with others.  (R. 567-68.)  She appeared to have difficulty dealing with stress related to her medical problems and pain.  (R. 568.)  Dr. Schreiber did not find that Nieves' psychiatric problems were significant enough to interfere with her daily functioning.  (R. 568.)  Dr. Schreiber diagnosed depressive disorder not otherwise specified secondary to medical problems, generalized anxiety disorder, pain disorder not otherwise specified due to general medical condition, and ruled out schizoaffective disorder on Axis II; chronic back problems/pain, herniated disc and arthritis on Axis III.  (R. 568.)[2]

On May 15, 2009, State agency medical consultant Dr. M. Apacible reviewed the record and found that Nieves had no significant psychological limitations other than a moderate limitation of her abilities to set realistic goals and make independent plans.  (R. 587-603.)  Dr. Apacible nevertheless concluded that Nieves had a severe impairment that did not meet or medically equal a listed impairment and would not prevent her from performing her past job as a domestic worker.  (R. 603.)

---

[2]     The multi axial system of analysis is used to assess a patient's physical and mental condition along five axes, each referring to a specific domain of information.  Axis I pertains to clinical disorders; Axis II pertains to personality disorders; Axis III pertains to general medical conditions; Axis IV pertains to environmental and psychosocial problems; and Axis V references the patient's GAF.  A GAF of 55 indicates moderate symptoms or moderate difficulty in occupational, school and social functioning.  Diagnostic & Statistical Manual of Mental Disorders 27-34 (4th ed. rev. 2000).

On May 6, 2010, Dr. Pazure, a psychiatrist at St. Vincent's Hospital, wrote a note indicating that Nieves participated in the outpatient programs for therapy and medication, and was in the process of transferring her care to a new provider.  (R. 621.)

Nieves submitted emergency room discharge instructions dated May 17, 2010, from Beth Israel Medical Center.  (R. 616, 624-26.)  The instructions reflected that Dr. Melvin Gilbert diagnosed her with major depression.  (R. 616.)  She received prescriptions for Zoloft and Ambien to treat depression and trouble sleeping, respectively.  (R. 624.)  Nieves also submitted a note from Beth Israel indicating that she had an appointment to see Dr. Celena Dancort on May 24, 2010.  (R. 615.)

**After January 1, 2011**

At the administrative hearing, consultant Dr. Malaret reviewed the record and testified that it did not contain any evidence regarding Nieves' medical condition as of the amended onset date of January 1, 2011.  (R. 53.)  Similarly, consultant Dr. Jennifer Cortes, a psychologist, reviewed the record and testified that there were no medical records regarding a psychiatric condition as of the amended onset date, other than a list of medications including Zoloft and Ambien.  (R. 55.)

**The ALJ Hearing**

At the ALJ hearing on May 17, 2011, ALJ Ferrer asked Nieves when she had stopped working because the record reflected that she had income in 2009 and 2010.  (R. 28.)  Nieves first responded "[i]n 2007," but after ALJ Ferrer asked a second time, Nieves admitted that she babysat for a friend in 2009 and 2010, earning $11,267 and $12,468 respectively.  (R. 28-29.)

ALJ Ferrer also asked Nieves about her employment income for 2008, and Nieves responded that she cleaned apartments once a week for six months, and earned between seventy-five and eighty-five dollars per day.  (R. 33-34.)  ALJ Ferrer noted that the amount which Nieves testified earning did not add up to her reported 2008 earnings of $11,175.  (R. 34.)  Nieves then acknowledged that from 2007 through 2010, she helped three elderly people with shopping, cleaning, and transportation.  (R. 34-36.)

Finally, ALJ Ferrer asked Nieves to confirm when she stopped working.  (R. 37.)  Nieves responded that she worked through the end of 2010, and denied working in 2011.  (R. 37-38.)  However, Nieves also testified that she did not know whether a search of Social Security records would show any earnings from 2011.  (R. 38.)

After the hearing, on May 25, 2011, ALJ Ferrer subpoenaed Nieves' medical records from Beth Israel.  (R. 229, 384.)  On June 20, 2011, Beth Israel responded by declining to process the request because it was made from out of state.  (R. 227.)

On June 1, 2011, Nieves' attorney sent a letter to ALJ Ferrer stating that Nieves had not worked after her alleged onset date and that confusion and anxiety caused Nieves to testify that she worked after January 1, 2009.  (R. 299.)  Nieves' counsel requested that ALJ Ferrer consider the original onset date.  (R. 299.)  In support, Nieves' attorney attached a document from the New York State Department of Labor that showed payment of unemployment benefits to Nieves from March 23, 2008 through March 28, 2010.  (R. 300-08.)

**ALJ Ferrer's Decision**

On July 22, 2011, ALJ Ferrer issued a written decision denying Nieves' application for DIB and SSI benefits.  (R. 9-19.)  ALJ Ferrer reviewed Nieves' claim of disability resulting from

14

her osteoarthritis and depression, considering Nieves' testimony and the medical record.  (R. 12-18.)[3]

ALJ Ferrer applied the appropriate five-step legal analysis.  (R. 13-18.)  First, ALJ Ferrer found that Nieves had not "engaged in substantial gainful activity since January 1, 2011, the amended alleged onset date."  (R. 14.)  At this stage, ALJ Ferrer found that Nieves' inconsistent testimony about her work history diminished her credibility and that the work activity itself undermined her claim of disability.  (R. 14-19.)  ALJ Ferrer observed that Nieves first testified that she had last worked in 2007, but when confronted with her record of earnings from 2009 and 2010, Nieves admitted to working as a babysitter.  (R. 14.)  When asked about 2008, Nieves claimed she worked for only six months, earning eighty-five dollars one day a week for cleaning.  (R. 15.)  When asked about the disparity between her claimed earnings and the $11,175 amount on her 2008 earnings record, Nieves admitted that she actually had a second job assisting elderly clients with cleaning, shopping and transportation.  (R. 15.)  Nieves acknowledged that she did this work through 2010, while she was babysitting.  (R. 15.)

Second, ALJ Ferrer determined that Nieves' medical evidence, when examined in the context of her unreliability, contained no severe impairment or combination of impairments.  (R. 15.)  ALJ Ferrer noted that consultative examiner Dr. Tranese examined Plaintiff and found her to have moderate to severe limitations of her abilities to lift, bend, squat, walk and climb.  (R. 17.)  ALJ Ferrer gave Dr. Tranese's opinion little weight because he appeared to rely heavily on Nieves' subjective complaints, which the ALJ found to be unreliable.  (R. 17.)  Furthermore, ALJ Ferrer

---

[3]    Although ALJ Ferrer's decision did not explicitly list depression in the Finding 3 heading (R. 15), her discussion regarding Nieves' depression elsewhere in the decision makes clear that it was assessed as a medically determinable impairment (see R. 16-18).

noted that Nieves failed to disclose to Dr. Tranese that she was working as a babysitter and helping elderly clients.  (R. 17.)  This activity was inconsistent with her statements to Dr. Tranese that she needed assistance with cleaning and shopping.  (R. 17.)  In addition, Nieves' testimony at the hearing showed that her impairments did not impose significant limitations during the period that Dr. Tranese examined Nieves.  (R. 17.)

Similarly, ALJ Ferrer gave little weight to Dr. Schreiber's opinion because Nieves did not tell Dr. Schreiber that she was working.  (R. 17.)  ALJ Ferrer noted that the clinical signs failed to document significant limitations.  (R. 17.)  Specifically, Dr. Schreiber found that Nieves' memory, attention and concentration were intact, she had good insight and judgment, and her thought process was coherent and goal-directed.  (R. 17.)  ALJ Ferrer observed that neither Dr. Tranese nor Dr. Schreiber noted that Nieves experienced any side effects from her medications.  (R. 17.)  ALJ Ferrer did not accord significant weight to the State agency psychiatric consultant because she relied on Dr. Schreiber's report.  (R. 17.)

ALJ Ferrer concluded that the remaining medical evidence did not establish that Nieves had medically severe impairments.  For example, the social worker who examined Nieves and reported moderate depression in January 2009 was not a specialist.  (R. 18.)  April 2009 notes reflected that Nieves experienced back pain, yet she refused the recommended treatment of an epidural injection.  (R. 18.)  In addition, Dr. Pak reported that Nieves walked with an antalgic gait in January 2009, but no similar observations were reported on subsequent examinations.  (R. 18.)  Moreover, despite Nieves' complaints of back pain, she continued working.  (R. 18.)

ALJ Ferrer also noted that in the absence of treatment records concerning a mental impairment, there was no evidence of any limitations of activities of daily living, social functioning

or maintaining concentration, persistence and pace, nor evidence of episodes of decompensation. (R. 18.)  Here, ALJ Ferrer noted that both she and Nieves' counsel were unsuccessful in obtaining any evidence from Beth Israel, where Nieves claimed to receive mental health treatment.  (R. 18.) ALJ Ferrer concluded that Nieves was not "under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of [the] decision," July 22, 2011.  (R. 18.)

On August 4, 2011, Nieves requested review by the Appeals Council.  (R. 7.)  In connection with her request for review of ALJ Ferrer's decision,  Nieves submitted progress notes regarding her psychiatric treatment from Beth Israel dated January 17, 2012 through May 8, 2012. (See R. 1.)  On November 7, 2012, the Appeals Council denied Nieves' request for review.  (R. 1-3.) The Appeals Council explained that because the new records concerned Nieves' condition after July 22, 2011, the date of ALJ Ferrer's decision, they did not affect the decision that Nieves was not disabled on or before July 22, 2011.  (R. 1.)  On February 5, 2014, the Appeals Council amended the Administrative Record before this Court to include these progress notes from Beth Israel.  (Dkt. No. 21: Amended Administrative Record filed by the Comm'r ("Am. R.") 627-61.) [4/]

**Nieves' Motion to Remand And Additional Medical Evidence**

While titled a motion for judgment on the pleadings, Nieves' counsel's March 3, 2014 brief only seeks a remand to the Commissioner to consider additional medical evidence.  (Dkt. No. 23: Nieves Motion; Dkt. No. 24: Nieves Br. at 10-15.)  This additional evidence consists of progress notes regarding Nieves' psychiatric treatment, signed by Dr. Marantz and Dr. Dancourt at Beth Israel

---

[4/]     The 2012 records mostly reflect Nieves' concerns about her mother's declining health and Nieves' sadness when her mother died  (Am. R. 633, 636, 639, 642, 648), with improvement as time passed and she received some inpatient treatment (Am. R. 651, 654).

and dated from June 27, 2010 through May 8, 2012.  (Dkt. No 24: Brill Aff. Exs. 1-4.)  Nieves did

not present any additional medical evidence as to her physical issues (i.e., arthritis).

   The earliest dated note, from Dr. Dancourt, dated July 27, 2010, stated that Nieves

had been admitted to the hospital for seventy-two hours but Nieves felt "much better" after the

admission and was instructed to continue on Zoloft.  (7/27/10 Dancourt Note.)  At a follow-up

appointment on October 14, 2010, Dr. Dancourt reported that Nieves "is brighter in affect today and

seems to be in a better mood."  (10/14/10 Dancourt Note.)

   On November 12, 2010, Dr. Dancourt found that Nieves "appears in a better mood

and states she feels she has improved.  She has been taking the medication as prescribed and has not

found any problems with it.  [Nieves] states [that] . . . her mood has improved overall . . . ."

(11/12/10 Dancourt Note.)  Significantly, Dr. Dancourt also reported that:

> [Nieves] had paperwork sent from a lawyer requesting help with obtaining
> disability.  [F]rom a psychiatric standpoint, [Nieves] does not meet criteria,
> at the moment, for disability as she is improving on the medication and she
> is not treatment resistant.  [Nieves] informed of the above and agrees with
> clinical determination.

(11/12/10 Dancourt Note at 6, emphasis added.)

   In the last note before the July 22, 2011 decision date, Dr. Dancourt on April 8, 2011

reported that Nieves' "mood fluctuates with the pain but overall she has been doing well on the

Zoloft, no side effects reported."  (4/8/11 Dancourt Note.)

## ANALYSIS

I.   **THE APPLICABLE LAW**

   A.   **Definition Of Disability**

         A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[5/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of

---

[5/]   See also, e.g., McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[6/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[7/]

**B.    Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[8/]  "'Thus, the role of the district court is

---

[6/]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[7/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[8/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[9/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[10/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[11/]

---

[9/]    See also, e.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *8 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.); Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[10/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[11/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[12/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[13/]

## II.   APPLICATION OF THE SEQUENCE TO NIEVES' CLAIM

### A.   Nieves Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Nieves was engaged in substantial gainful activity after her application for SSI benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Ferrer's conclusion that Nieves did not engage in substantial gainful activity during the amended applicable time period (see pages 12-13 above) is not contested by the parties. (See generally Dkt. No. 16: Comm'r Br.; Dkt. No. 24: Nieves Br.) The Court therefore proceeds to the second step of the five-step analysis.

---

[12/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[13/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

**B.     Nieves Did Not Demonstrate "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Nieves proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).  "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"  McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report & rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[14/]

---

[14/]    Accord, e.g., Whiting v. Astrue, Civ. Action No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.'  Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within (continued...)

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

### 1.    The Medical Records Post-Dating The January 1, 2011 Amended Onset Date Provide No Evidence that Nieves' Impairments Are Severe

ALJ Ferrer correctly determined that the medical evidence indicated that Nieves' impairments of osteoarthritis and depression were not severe.  (See pages 14-16 above.)  ALJ Ferrer found that the record contained no medical evidence related to Nieves' physical impairments, aside from Nieves' medication list, after the amended onset date of January 1, 2011.  (R. 16.)  Indeed, Nieves does not contest the ALJ's findings as to physical impairments.  (See generally Dkt. No. 24: Nieves Br.)  As to Nieves' depression, ALJ Ferrer likewise found that the record contained no evidence of restrictions to Nieves' functional areas of "daily living, social functioning and maintaining concentration, pace and persistence," nor was there evidence of "episodes of decompensation for the relevant period" after the alleged onset date.  (R. 18.)  Thus, the record

----

[14]/       (...continued)
          the meaning of the Social Security Act.").

lacked any "evidence of restrictions to the functional areas, which include activities of daily living, social functioning and maintaining concentration, pace and persistence."  (R. 18.)

### 2.    Evidence of Minimal Impairments Before the Amended Onset Date Lacked Credibility

ALJ Ferrer found that the evidence of alleged impairments before the January 1, 2011 amended onset date showed only minimal physical limitations that were insufficient to significantly limit Nieves' ability to work during that time.  (R. 17.)

Because subjective symptoms like pain only lessen a claimant's ability to do basic work activities where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("[T]he ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the

ALJ must make credibility findings.").[15/]  In addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[16/]

ALJ Ferrer "considered all [Nieves'] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and determined that Nieves' inconsistent testimony concerning her work history and

---

[15/]  See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (The ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine."); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (The ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record.); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[16/]  Accord, e.g., Campbell v. Astrue, 465 F. App'x 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

earnings diminished her credibility, drawing into question the medical reports that relied "quite heavily" on her descriptions of her symptoms.  (R. 14, 17.)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96–7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citations & brackets omitted).[17/]

ALJ Ferrer properly applied this two-step process to Nieves' case.  (R. 14-18.)  She assessed Nieves' credibility by considering all of the medical evidence in the record in light of Nieves' statements.  (R. 14-18.)  First, ALJ Ferrer found that Nieves gave inconsistent testimony about her past employment and earnings, which diminished her credibility and the reliability of her statements to medical personnel.  (R. 14, 17.)  At the hearing, Nieves initially indicated that she had last worked in 2007, and only admitted that she had worked from 2009 to 2010 when ALJ Ferrer confronted her with Social Security records documenting significant income for those years.  (R.

---

[17/]     Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

14-15.)  As to 2008, Nieves first claimed that she only earned $4,420, but after ALJ Ferrer told her that her Social Security record reflected earnings of $11,175, she acknowledged that she worked assisting elderly people with shopping, traveling, and cleaning.  (R. 15.)

In light of these conflicting representations, ALJ Ferrer properly determined that Nieves was not credible.  See, e.g., Torres v. Colvin, 12 Civ. 6527, 2014 WL 241061 at *11-13 (S.D.N.Y. Jan. 22, 2014) ("The ALJ did not believe [plaintiff's] testimony regarding his work history and specifically stated so in his decision. . . .  The statements recorded in the Concourse medical records are consistently at odds with [plaintiff's] testimony regarding his work history.  In addition, there are many other inconsistencies in the record.  [Plaintiff] reported different dates for when he stopped working: 1995, 1999, 2000, and 2001. . . .  The inconsistencies between [plaintiff's] oral testimony and the documentary record, as well as the internal inconsistencies in the documentary record, constitute substantial evidence supporting the ALJ's negative credibility determination."); Nunez v. Astrue, 2013 WL 3753421 at *11-12 ("[T]he ALJ found . . . that the plaintiff was not a credible witness. . . . First, the ALJ found that plaintiff's testimony about her work history varied from her previous reports. . . . The ALJ also noted that plaintiff's testimony about the amount of work she performed in the past conflicted with her other reports about her work history."); Pidkaminy v. Astrue, 919 F. Supp. 2d 237, 251-52 (N.D.N.Y. 2013) ("Plaintiff stated in one report that he had not worked since 1984.  In another report, he stated that he had stopped working in 1998. At the ALJ hearing, Plaintiff testified that he had been laid off in 2001.  Later at that same hearing, after the ALJ had pointed out that the Commissioner had information about him working in 2004 and 2008, Plaintiff admitted that he had, in fact, worked in 2004 and 2008 . . . .  [T]he Court finds that the ALJ applied the proper legal standard in evaluating Plaintiff's credibility and that there was

substantial evidence in the record to support his credibility determination." (record citations omitted)).

Second, ALJ Ferrer properly discounted the medical opinion evidence prior to the alleged onset that supported Nieves' claim of severe mental and physical impairment, because those opinions were based largely on Nieves' descriptions of her limitations, which the ALJ found not credible.  "An ALJ may disregard a medical opinion premised on a Plaintiff's self-reported symptoms if the ALJ has reason to doubt Plaintiff's credibility." Stroud v. Astrue, No. 09-CV-0357, 2010 WL 2671785 at *6 (W.D.N.Y. July 1, 2010); see, e.g., Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) ("[S]ubstantial evidence supported the ALJ's decision not to adopt many of [the doctor's] conclusions [where] . . . [the doctor] thought [plaintiff] was not completely forthcoming during the examination . . . ."); Kruppenbacher v. Astrue, 04 Civ. 4150, 2010 WL 5779484 at *42 (S.D.N.Y. Apr. 16, 2010) ("A credibility determination is a valid reason for rejecting the opinion of a treating physician."), report & rec. adopted, 2011 WL 519439 (S.D.N.Y. Feb. 14, 2011); see also cases cited at page 28 above.

Dr. Tranese, who examined Nieves in 2009, reported moderate to severe limitations with lifting, bending, squatting, walking or climbing.  (R. 17.)  ALJ Ferrer found, however, that Nieves failed to disclose to Dr. Tranese that "she worked babysitting, helping the elderly shop, and cleaning their homes," which "revealed that her impairments did not impose significant limitations during the same period the physician examined her."  (R. 17.)  Similarly, Dr. Schreiber examined Nieves in 2009 and "rendered an opinion consistent with a person that had few limitations."  (R. 17.)  But because Nieves did not inform Dr. Schreiber that she was working during that time, Dr. Schreiber based her opinion on the false premise that Nieves stopped working in 2007.  (R. 17.)  Likewise, because both Dr. Apacible and Dr. Fletcher based their opinions on those of Dr. Schreiber

and Dr. Tranese, respectively, ALJ Ferrer determined that their opinions also were unreliable. (R. 17.)

Moreover, ALJ Ferrer correctly determined that although Nieves complained of pain and other symptoms "[b]etween 2003 and 2010, there [was] evidence of minimal limitations," and "the limitations found did not prevent [Nieves] from working during this time." (R. 17.) Physicians at St. Clare's Hospital stated in 2003 that Nieves had joint pain and difficulty ambulating, but they offered no treatment notes or objective medical tests in support of their conclusory opinion. (R. 17.) An internist examination stated that Nieves "was able to sit, stand, walk, handle objects . . . and travel." (R. 17.) A physical examination in 2005 alluded to walking impairments, but Nieves continued to work. (R. 18.) In 2009, Nieves reported back pain, but "refused on multiple occasions the physician-recommended" treatment, and "[d]espite all of this, [Nieves] continued to work." (R. 18.) A 2003 psychiatric evaluation only suggested "mild symptoms" (R. 17-18) and a 2009 evaluation reporting "moderate depression" was performed by a social worker, not a specialist (R. 18), and thus ALJ Ferrer was not bound to give it any weight. Griffin v. Colvin, No. 12-CV-976, 2014 WL 296854 at *6 (N.D.N.Y. Jan. 27, 2014) ("[L]icensed clinical social workers['] . . . source opinions, even when based on treatment and special knowledge of an individual, never enjoy a controlling weight presumption. Nor can 'other' source opinion[s] be relied upon to establish existence of a medically determinable impairment." (fn. omitted)).[18]

---

[18]    See also, e.g., Desmond v. Astrue, No. 11-CV-0818, 2012 WL 6648625 at *9 (N.D.N.Y. Dec. 20, 2012) ("[B]ecause the Regulations do not classify therapists or social workers as either physicians or 'other acceptable medical sources,' the ALJ was not bound to give [the social worker's] opinion any special weight."); Jones v. Astrue, No. 09-CV-1232, 2012 WL 1605566 at *4 (N.D.N.Y. Apr. 17, 2012), report & rec. adopted, 2012 WL 1605593 (N.D.N.Y. May 8, 2012); Rushford-Spink v. Astrue, No. 08-cv-827, 2010 WL 396359 at *9 (N.D.N.Y. Jan. 25, 2010); Lint v. Astrue, No. 07-CV-0479, 2009 WL 2045679 at *9 (continued...)

Accordingly, ALJ Ferrer met her burden in finding Nieves' claims not credible because the dearth of objective medical evidence both before and after the alleged onset date failed to support Nieves' claims of disability based on pain.  See, e.g., Campbell v. Astrue, 465 F. App'x at 6 (ALJ does not have to reconcile every single piece of conflicting testimony); Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (Plaintiff "testified that she is able to do light chores around the house, including washing dishes, doing laundry and cooking. [Plaintiff] also is able to take public transportation on her own and take walks.  Thus, [the] ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); DiPalma v. Colvin, 951 F. Supp. 2d 555, 574 (S.D.N.Y. 2013) (Peck, M.J.) (ALJ's negative credibility determination was proper where, "[d]espite complaining of substantial pain when he walked or drove for more than forty-five minutes, [plaintiff] did 'not take any medication for relief of pain—which is [a] major inconsistency'"); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily

---

[18]/     (...continued)
(N.D.N.Y. July 8, 2009).

activities as one factor, among others suggested by the regulations"), report & rec. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

In light of the foregoing, ALJ Ferrer correctly determined at step two that Nieves' physical and mental "impairments, considered singly and in combination, do not significantly limit the claimant's ability to perform basic work activities."  (See page 14 above.)  See, e.g., McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980) ("'ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'"); Whiteside v. Colvin, No. 12-CV-889, 2014 WL 585303 at *8 (W.D.N.Y. Feb. 13, 2014) ("[U]pon review of the record as a whole, the court finds that the ALJ did not commit legal error by concluding his analysis at step two of the sequential evaluation, and that there is substantial evidence in the record to support his determination that plaintiff's impairments, considered alone or in combination, are not 'durationally severe.'"); Impala v. Astrue, No. 10-cv-505, 2011 WL 2456356 at *2, *5 (D. Conn. June 15, 2011) ("The ALJ considered the plaintiff's alleged impairments, but the objective medical evidence showed that those conditions were not severe.  The ALJ accordingly ended his analysis at step two of the sequential evaluation process and concluded that the plaintiff was not disabled. . . . [T]he ALJ's determination was proper." (record citation omitted)), aff'd, 477 F. App'x 856 (2d Cir. 2012); Mitchell v. Astrue, No. 10 CV 902, 2011 WL 9557276 at *13 (D. Conn. May 24, 2011) (affirming the Commissioner's decision where, "[a]t step two of the sequential analysis, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities . . . and thus plaintiff did not have a 'severe' impairment"), report & rec. adopted, 2012 WL 6155797 (D. Conn. Dec. 11, 2012).

III.    **THE COURT SHOULD NOT REMAND THIS ACTION TO THE COMMISSIONER BECAUSE THE NEWLY SUBMITTED EVIDENCE SUPPORTS THE COMMISSIONER'S DECISION AND IS NOT MATERIAL TO NIEVES' CONDITION DURING THE RELEVANT TIME PERIOD**

In support of her appeal, Nieves submitted progress treatment notes regarding her psychiatric treatment, signed by Dr. Marantz and Dr. Dancourt at Beth Israel and dated from June 29, 2010 through May 8, 2012. (Dkt. No. 24: Nieves Br. at 10-15; Dkt. No. 24: Brill Aff. Exs. 1-4.)

A.      **The Amended Administrative Record Supports the Commissioner's Decision**

When a claimant submits new and material evidence to the Appeals Council upon a request for review of the ALJ's decision and the Appeals Council denies review, the evidence becomes part of the record. Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996); Jones v. Apfel, 66 F. Supp. 2d 518, 525 (S.D.N.Y. 1999) (Pauley, D.J. & Peck, M.J.). The Court then must review the amended administrative record to determine whether there is substantial evidence to support the Commissioner's decision. Perez v. Chater, 77 F.3d at 46; Jones v. Apfel, 66 F. Supp. 2d at 536.

The Appeals Council referred to Nieves' newly submitted mental health treatment notes dated from January 2012 through May 2012 but found that they did not affect the decision that Nieves was not disabled on or before July 22, 2011, the relevant time period. (R. 1.) The Court agrees that Nieves' mental state in 2012 (see page 16 n.4 above) – affected by her mother's illness and death – shed no new light on her mental health before July 22, 2011. See, e.g., Morel v. Massanari, 01 Civ. 0186, 2001 WL 776950 at *8 (S.D.N.Y. July 11, 2001) (Peck, M.J.) (& cases cited therein).

B.      **The Newly Proffered Medical Evidence Is Not Material To The Commissioner's Decision**

Nieves' progress notes dated June 29, 2010 through December 2011 are not part of the Administrative Record. (See Dkt. No. 24: Brill Aff. Exs. 1-4.) Evidence not contained in the

administrative record may not be considered when reviewing the findings of the Commissioner.

See, e.g., 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security . . . ."); Carnevale v. Gardner, 393 F.2d 889, 891 n.1 (2d Cir. 1968) (district court correctly refused to consider materials not properly in administrative record); Castro v. Acting Comm'r of Soc. Sec., 97 Civ. 5364, 1998 WL 846749, at *10 n.11, 1998 U.S. Dist. LEXIS 18973 at *30 n.11 (S.D.N.Y. Nov. 5, 1998) (new evidence not considered because "this court is limited in its review to the record before the Commissioner"), report & rec. adopted, 1998 WL 846749 (S.D.N.Y. Dec. 2, 1998); Grubb v. Chater, 992 F. Supp. 634, 637 n.3 (S.D.N.Y. 1998) (new evidence not considered because "[a] court's review of the Commissioner's decision is to be based upon the administrative record"); Madrigal v. Callahan, 96 Civ. 7558, 1997 WL 441903 at *7 (S.D.N.Y. Aug. 6, 1997) ("in reviewing decisions of the Commissioner, this Court cannot consider new evidence not made part of the administrative record").

Although the Court cannot consider new evidence, this Court may remand to the Commissioner to consider new evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized the three-part showing required by this provision as follows:

> [A]n appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991) (citations & quotations omitted, emphasis added) (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)).[19]

The newly proffered treatment notes indicate that Nieves was treated only once between January 1, 2011 and July 22, 2011, the period under review.  (R. 12-19.)  Specifically, she visited Dr. Dancourt on April 8, 2011.  (See page 17 above.)  When new medical evidence pertaining to a plaintiff's impairment reveals that the condition was generally under control with proper medication, the evidence does not alter the Commissioner's final decision.  See Hursey v. Apfel, No. 97-CIV-4757, 1998 WL 812585 at *4 (E.D.N.Y. Apr. 27, 1998).  On April 8, 2011, Dr. Dancourt stated that Nieves' "mood fluctuates with [her knee] pain but overall she has been doing well on the Zoloft, no side effects reported."  (See page 17 above.)  Because the April 8, 2011 treatment notes reveal that appropriate medication effectively stabilized Nieves' mental condition, this new evidence fails to meet the materiality standard.

Moreover, the June 27, 2010 through December 2010 treatment notes (see page 17 above) reflect that Nieves' alleged mental impairment was stable and she was able to work, and therefore, her condition was not disabling. "If [the claimant]'s mental condition never deteriorated from what it was while she was working, she cannot claim to have become disabled by reason of a mental impairment."  Snell v. Comm'r of Soc. Sec., 177 F.3d 128, 136 (2d Cir. 1999.)  On November 12, 2010, Dr. Dancourt stated that "from a psychiatric standpoint, [Nieves] does not meet

_____

[19]    Accord, e.g., Lisa v. Secretary Dep't of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991); DeJesus v. Apfel, 97 Civ. 4779, 2000 WL 1586419 at *3 (S.D.N.Y. Oct. 24, 2000); Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *2 & n.6  (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); Pantojas v. Apfel, 87 F. Supp. 2d 334, 339 (S.D.N.Y. 2000); Casiano v. Apfel, 39 F. Supp. 2d 326, 331 (S.D.N.Y. 1999), aff'd, 205 F.3d 1322 (2d Cir. 2000); Hursey v. Apfel, No. 97 Civ. 4757, 1998 WL 812585 at *4 (E.D.N.Y. Apr. 27, 1998); Tracy v. Apfel, No. 97 Civ. 4357, 1998 WL 765137 at *4 (E.D.N.Y. April 22, 1998); Madrigal v. Callahan, 1997 WL 441903 at *7-8; Counterman v. Chater, 923 F. Supp. 408, 414 (W.D.N.Y. 1996).

criteria, at the moment, for disability as she is improving on the medication and she is not treatment resistant, [Nieves was] informed of the above and agrees with clinical determination." (See page 17 above.)  Thus, if anything, the new evidence confirms the ALJ's decision that Nieves was not disabled.

Accordingly, Nieves' newly proffered evidence supports the ALJ's decision and does not require a remand.

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that Nieves was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 13) should be GRANTED and Nieves' motion to remand (Dkt. No. 23) should be DENIED.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Alison J. Nathan, 40 Foley Square, Room 2102, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Nathan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992), cert. denied, 506

37

U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d

Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated:        New York, New York
              April 3, 2014

                                        Respectfully submitted,


                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge


Copies ECF to: All Counsel
               Judge Alison J. Nathan